Van Voorhis, J.
(dissenting). In order to classify a matter for the purposes of taxation or otherwise, the law looks at the substance and not merely at the form of the transaction. The application of this rule to the facts of this case, in my opinion, sustains the taxpayer’s position.
Petitioner, the New York World-Telegram Corporation, hereinafter described as the Publishing Company, has been assessed for the payment of $49,570.27, including interest and penalties, under the New York City sales tax law, based on *807 alleged rentals paid to a now dissolved subsidiary for the use of its tangible personal property from the effective date of the sales tax on December 10, 1934, to and including June 30,1940. Rental for the use of such property is taxable under the law (Local Laws, 1934, No. 20 of City of New York [published as No. 21], as amd. by Local Laws, 1934, No. 24 [published as No. 25], § 1, subd. [e]), but “Where tangible personal property was sold on the installment plan and delivered to the purchaser before December 10, 1934, the tax does not apply to the receipts therefrom though payment therefor is made on and after December 10, 1934.” (Comptroller’s Regulations, City Sales Tax, art. 29.)
Petitioner’s so-called lease agreement was entered into October 1, 1931, which is the time when it took possession of the real and personal property covered thereby. If, as the City contends, the payments after December 10, 1934, were in the nature of rent, they were properly taxable insofar as they were paid for use of the personal property; on the other hand, if they are regarded as installments on the purchase price under a contract of conditional sale made when petitioner took possession on October 1, 1931, no sales tax can be imposed.
It is true that in preparing the agreement the parties called it a lease and employed the terminology of the relationship of landlord and tenant, but “ That this contract is something more than a lease, and that it has the essential attributes of a contract for a conditional sale does not admit of doubt.” (Central Union Gas Co. v. Browning, 210 N. Y. 10, 12.) The complex provisions of this document, insofar as the issue now before the court is concerned, can be simplified and condensed into the statement that the party described in the instrument as the “ lessee ” is given an option to acquire title from the “ lessor ” to the property subject to the “lease” without paying more than the “rent" after enough installments shall have been paid to become equal to the purchase price, which is certain to occur before the expiration of the lease if the obligations of the parties as expressed in the instrument are fully performed. The lessee may accelerate the time for exercising the option by paying the balance of the purchase price at an earlier date.
Clause (2) of section 1 of the Uniform Conditional Sales Act, adopted in New York State as section 61 of the Personal Property Law, defines a conditional sale so as to include “ * * * any contract for the bailment or leasing of goods by which the bailee or lessee contracts to pay as compensation a sum substantially equivalent to the value of the goods, and by which it is agreed that the bailee or lessee is bound to become, or has the option of becoming the owner of such goods upon full compliance with the terms of the contract.” Dean Bogert, the draftsman of this act, has annotated this section classifying numerous cases wherein so-called leases have been held to be conditional sales (2A U. L. A. 1-27). He states at p. 23: “In still a third class of cases the arrangement is slightly different. The buyer is to have the option at the end of his rental payments, of becoming the owner of the leased goods. Here a sale will obviously result if all the rent is paid. No. man is going to decline the option of becoming owner of the leased goods, when he can acquire them by the mere expression of his wish. Nothing is to be paid beyond the so-called rent. If the payment of the rent is to give the so-called lessee the option of becoming the owner of the goods, clearly the rent is the purchase price in disguise. The eases have treated this contract as a conditional sale ”, citing in this State, Jacob v. Haefelien (54 App. Div. 570) and Gardner v. Town of Cameron (155 App. Div. 750, affd. 215 N. Y. 682) to which the following quotation *808 is added from Wilcox v. Cherry (123 N. C. 79, 83): “ We cannot imagine that a business man of common sense would rent property upon exactly the same terms upon which he could buy it * * *.” (See, also, Bramhall, Deane Co. V. McDonald, 172 App. Div. 780; 1 Williston on Sales [2d], § 336.)
Although the relationship between the parties in this proceeding was intricate, the net result seems as clear and conclusive as under the simpler statements of fact presented in the cases above cited. A brief resumé of the more important details is in order: In 1931, the Publishing Company became .the owner of two newspapers known as the New York World and the New York Telegram. It was desired to raise money by the sale of preferred stock. Confronted by difficulties in selling stock under market conditions in the early 1930’s, it sought to strengthen the proposed issue by vesting the tangible assets in a subsidiary corporation whose fortunes would not be subject to the hazards of the newspaper publishing business, and by issuing preferred stock in the subsidiary. World Telegram Building and Equipment Corporation, for convenience hereinafter referred to as the Building Company, had been organized for that purpose. It first entered into a lease dated May 1, 1930, of real property at 125 Barclay Street with Rhinelander Real Estate Company for twenty-one years with the privilege of three successive renewal periods of like duration. Thereafter and prior to October 1, 1931, it erected a building on said land at a cost of $1,876,113.46, the money for which was supplied by the Publishing Company. On October 1, 1931, the Publishing Company transferred to the Building Company its presses, type, typesetting and stereotyping machinery, together with all of its other tangible personal property. In return, the Building Company delivered to the Publishing Company notes for $1,660,114.35, being the value and cost to the Building Company of the personal property, and for $1,876,113.46, being the cost and value of the building, and entered into the agreement with the Publishing Company which is the subject of this litigation.
By this so-called lease, the Publishing Company obtained the possession and use of the said building and equipment for the duration of the Rhinelander lease and renewal periods in consideration of covenanting to pay to the Building Company, therein described as lessor, (a) the amounts required to be paid to the Rhinelander Real Estate Company as rentals under the underlying lease; (b) the amounts required by the Building Company for payment of dividends upon its outstanding preferred stock thereafter to be issued and sold; (c) the amounts required by the Building Company for retirement of its preferred stock; (d) all taxes levied and assessed against the Building Company or upon its assets, earnings or business, and (e) all sums required by the Building Company to maintain its corporate existence, all maintenance and operating charges, including, specifically, interest on its outstanding notes, plus " a reasonable charge for or on account of depreciation on said building, machinery, equipment and all Leased Property above specified.” Said instrument further provided that the Building Company should not engage in any business other than the leasing and holding title to the leased property, and that all sums realized from the sale of its preferred stock should be applied to the payment of the outstanding notes hereinbefore referred to and held by the Publishing Company.
The option clause is to the effect that after October 1, 1937 (this being the date on which, under its charter, the Building Company was given the right to call for redemption its preferred stock), the Publishing Company should have the option to purchase the Rhinelander lease, the building and the machinery *809 and equipment by paying a sum equal to the cost of the building and personal property (represented by the notes above described held by the Publishing Company) less whatever had been paid to the Building Company for depreciation thereon as part of the “rent.” The pertinent language of the instrument at this point is: “The price to be paid shall be the sum of (a) the cost of said machinery and equipment less amounts paid by Lessee to Lessor on account of depreciation of said machinery and equipment * * * (b) the cost of said buildings, appurtenances and improvements less amounts paid by Lessee to Lessor on account of depreciation of said buildings, appurtenances and improvements * *.”
Inasmuch ns the Publishing Company, in addition to interest on the notes and other carrying charges and numerous other items, was required to pay as part of the rent reasonable charges for depreciation on all of the leased property, the conclusion is unavoidable that within the scope of the instrument after the Publishing Company should have been in possession of the real and personal property for long enough during the term of the lease, it must necessarily have paid to the Building Company the entire cost both of the building and of the personalty out of the rent. Paragraph (22) of this document states that it shall continue in force “ * * " during the term of any renewal or renewals of said Rhinelander lease (whether or not made at the request of the Lessee herein) so long as (a) any Preferred stock of the Lessor shall remain outstanding and/or (b) any of the notes of the Lessor outstanding on October 1, 1931, shall remain unpaid * * ”; it being subject to earlier termination if the Publishing Company should sooner defray these amounts so as to accelerate the time for exercising the option. This made the absolute term of the lease eighty-four years unless the total cost of the demised property were sooner amortized or paid. In carrying out the agreement the parties determined that the depreciation was truly reflected on a straight-line basis at the rate of 2% annually on the cost of the building and 10% annually on the cost of the personal property. That meant that as a final eventuality the building would be fully paid for out of the rents in fifty years, and the machinery and equipment in ten years from October 1,1931. 0
The purchase price under the option, as appears from the language above quoted, was to be computed separately with respect to the real and personal property, the latter being paid for on the basis of its cost ($1,660,114.35) “ less amounts paid by Lessee lo Lessor on account of depreciation of said machinery and equipment * " ®.” Since the city sales tax is imposed only with respect to the personal property, it is pertinent, to observe that the entire purchase price of the personal property under the option was bound to be defrayed out of the rents over a period of ten years, which is well within the eighty-four years latitude allowed for the purpose by the terms of the instrument. That means that the purchase price of the personalty, after allowing for the payment of interest, would have been wholly amortized out of the rent during the term of the lease if the machinery and equipment had depreciated less than one eighth as rapidly as the parties computéd.
Actually, the time for the exercise of the option was accelerated and title to the goods acquired by the Publishing Company in 1941 without waiting for the purchase price to be amortized out of the rent, and the Building Company was dissolved.
These facts in the record appear to me to demonstrate that paying the rent specified in the lease meant paying the full purchase price specified in the option.
There are other grounds for characterizing the transaction as a sale. For *810 example, the Publishing Company was obligated as “ additional rental ” to pay for the redemption of all of the $3,000,000 authorized preferred stock which the Building Company might elect to issue, the proceeds of which were required to be.applied first to payment of the notes issued for the cost of the building, machinery and equipment. That would, of course, make a corresponding reduction in the purchase price payable under the option, and accelerate the exercise of the option. Thus, by issuing preferred stock and calling it at any time after October 1, 1937 (the callable date specified in the certificate of incorporation), the Building Company could virtually have compelled the Publishing Company to exercise its option at any time thereafter. It is a perversion of the meaning of the word “rent” to apply it to such a payment as that.
Neither is the argument sound that petitioner had to cast this transaction of October 1, 1931, in the form of a lease in order to serve its purpose of improving the position of the preferred stock to be issued by the Building Company. The title to the tangible assets of the publishing business could equally well have been retained by the Building Company until payment of the purchase price if the contract had been described as one of conditional sale. The property in specific goods passes when the parties so intend (Personal Property Law, § 99), and the agreement without using the terminology of landlord and tenant could have been drafted just as effectively to protect the preferred stock. Moreover, if litigation had arisen affecting the preferred stockholders, the agreement would have been construed according to its nature and not as the parties chose to describe it (Central Union Gas Co. V. Browning, 210 N. Y. 10, supra).
Doubtless the conduct of these corporations in carrying these payments as business expenses on the one hand and business income on the other would merit consideration if the agreement itself had been ambiguous; but being long and involved does not make it ambiguous.
The fact that there is a subordination clause to mortgages which might be given by the Building Company does not characterize the instrument as a lease any more than does the similar privilege of issuing preferred stock which the Publishing Company as “ lessee ” was obligated to pay for retiring; in either instance the proceeds would have to be applied for the benefit of the Publishing Company as actual purchaser in view of the clause limiting the Building Company to “ 6 * * undertake no expense except that involved in connection with the leasing of the premises covered by said Rhinelander lease and the ownership and leasing of said buildings, improvements, goods and/or chattels herein demised.” No such mortgage could be entered into, therefore, except for the benefit of the Publishing Company with respect to the property which was the subject of the transaction. It is probable that this clause, as well as others, would not have been inserted unless the agreement had been between a parent corporation and its subsidiary, but that has no tendency either to impugn the transaction or to characterize it as a lease.
I think that this transaction of October 1, 1931, was in reality a conditional sale accompanied by delivery of the property, and, therefore, was not taxable under the New York City sales tax, notwithstanding that installments of the purchase price were payable after December 10, 1934 (Comptroller’s Regulations, City Sales Tax,.art. 29).
The determination by the respondent of sales tax deficiency against petitioner of $49,570.27 for the period from December 10, 1934, to June 31, 1940, should in all things be annulled.
*811 Colin, Callahan and Peek, JJ., concur in decision; Van Voorhis, J., dissents in opinion in which Martin, P. J., concurs.
Determination confirmed, with $50 costs and disbursements. No opinion.